IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 15, 2022 Session

## STATE OF TENNESSEE EX. REL. ALICIA JANELLE COLLINS v. VIKRAMJEET SETHI SINGH

**Appeal from the Juvenile Court for Shelby County**
**No. EE8639  Harold W. Horne, Judge[1]**

_____

**No. W2022-00239-COA-R3-JV**

_____

The State of Tennessee, on behalf of Mother, sought child support for a minor child.  The trial court, finding that there was no reliable evidence of Father's income, imputed the statutory median gross income.  Father appeals, asserting that the trial court erred in setting child support above his stated income and in finding that the evidence of his income was unreliable.  Father also asserts that the court's oral finding that he was willfully underemployed was procedurally deficient.  We conclude that the trial court erred in imputing the statutory amount, vacate the award of child support, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Vacated; Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Taylor R. Oyaas, Memphis, Tennessee, for the appellant, Vikramjeet Sethi Singh.

Jonathan Skrmetti, Attorney General & Reporter; and Carrie Perras, Assistant Attorney General, for the appellee, State of Tennessee ex rel. Alicia Janelle Collins.

**OPINION**

I.

_____

[1] Magistrate sitting as a special juvenile court judge for Judge Dan H. Michael.

On March 2, 2021, the State of Tennessee, on behalf of Alicia Janelle Collins (Mother) filed a petition seeking to establish the parentage of G.A.C., who was born in May 2019, and seeking child support pursuant to Title IV-D of the Social Security Act, 42 U.S.C. § 651 et seq. DNA testing established that Vikramjeet Singh (Father) was G.A.C.'s biological father.

A hearing was held before the magistrate in November 2021 via zoom. The magistrate granted the petition to establish parentage. She further found that Father's testimony regarding his income was not credible and that he failed to introduce reliable evidence of his income, and imputed to him the median gross income of $3,646.75 monthly. The court ordered Father to pay $949 per month in child support and $29,368 in retroactive child support. Mother and Father were ordered to share medical expenses.

Father sought a de novo hearing before the juvenile court. At the January 2022 zoom hearing, Father testified that he was married prior to his relationship with Mother and that he had three children from his prior marriage. During his marriage, Father was employed as a taxicab driver in New York. In New York, Father had taken out a loan to obtain a taxicab medallion, which permitted him to operate a taxicab and which had a value fluctuating between one million dollars and below $100,000. Father's obtaining of a medallion proved to be financially devasting because around 2016, rideshare businesses "destroyed the market." In 2017, Father moved to De Soto County in Mississippi at the urging of his wife, who left him four or five months after the move. G.A.C. was born of a relationship Father had with Mother outside of the marriage prior to the time Father's divorce was finalized.

Father testified that, after moving to Mississippi, he filed for bankruptcy in 2018 and was homeless for a period of time. In the bankruptcy proceedings, Father also lost his equity in his taxicab medallion. Father is no longer able to drive a taxi because the "hybrid cell" in his Prius stopped working and the cost of repair was so high that he "junked" the vehicle. Father has no car and is unable to get financing for a new vehicle due to the bankruptcy.

Father testified that he lives with a friend and that he pays his friend $200 per month for rent. Father testified, "[W]ith the utilities, I pay around [$]250 with internet and get to use the bathroom and a laundromat."[2] He testified he spends $80 to $100 per month on food. Father is not paying any child support for his three children with his ex-wife.

Father is currently employed at Singh and Sons gas station in Southaven, Mississippi, where he resides. He is not related to his employers, and he testified that Singh "is a common Indian name." Father stated that he earns $500 per month, working 12 to 13

---

[2] Father's counsel later asked him, "[Y]ou mentioned that you spend about $200 a month for rent, utilities, with a friend, correct?" Father agreed.

hours each week at $10 per hour. Father "stay[s] home" in his spare time. Father testified that he has applied for full-time work. Specifically, he has asked for full-time work from his current employers, but they told him they did not have enough business to employ him full time due to the pandemic. Father stated he has also applied for a job at a Circle K gas station and has "spoken" to the BP gas station, where they "said they will let me know [as] soon as their work picks up."

The court asked Father why he was not employed full time, observing, "There is not a Taco Bell, a Burger King, a McDonald's, a fast-food restaurant in this town that does not have a help wanted sign. There's not a grocery store that won't hire people if you can walk in the door." Father responded that he had no transportation and that there was no public transportation available where he lived. The court suggested walking, and Father replied, "[I]t's like two and half, three miles away from where I live." The court suggested bicycling, and Father stated he would "invest" in a bicycle. Father agreed with the judge that he was living "about a block away from Highway 51" and that "[a]round the corner from [him] is a dollar store and whole bunch of businesses." Father has no criminal record that would prevent him from working.

Father's W-2s were introduced at trial. They showed that, from his employment with Singh and Sons, Father earned exactly $9,000 in 2019, $6,000 in 2020, $6,000 in 2021. Social security and Medicare taxes were withheld in the amounts of $689 in 2019 and $459 in 2020 and 2021. Father testified that his employers paid him even when he was ill with COVID-19 and that he was able to borrow money from them to send to his mother. His employers would pay him early if he needed the money. Father's brother loaned him $3,000 to pay for the attorney who represented him in juvenile court. Father testified that his tax documents included all advances or sick pay he received from his employers. His pay was greater in 2019 because he was able to work more hours prior to the pandemic. Father testified that he did not receive any income outside that reported on the W-2s.

Father's Marital Dissolution Agreement governing his divorce and his support for the three children from his marriage to his ex-wife was entered into evidence. It provided that neither parent would pay child support, that both parents understood "this is an unusual legal situation," and that "[t]he children are well provided for by each parent." Father was responsible for one half of all medical, dental, and drug bills not covered by insurance and one half of all educational expenses. Although he was awarded some weekend and holiday visitation in the agreement, Father testified at trial that he had no overnight visitation with any of his children.

Father stated that he initially gave Mother "whatever money I could have." Specifically, he "was giving her like $300 a month, $200 a month," prior to G.A.C.'s birth. According to Father, Mother asked for more money, and then she "cursed [Father] out in front of everybody." Mother and Father have not had contact since that time. Father testified that he stopped giving Mother money in February prior to G.A.C.'s May birth. He

was still married to his ex-wife at the time. Father clarified that he was paying $200 and $300 per month to Mother in 2018 and 2019, when he was working more hours. Father's counsel asked him, "Can you afford to pay two to three hundred dollars a month as it stands?" He answered, "Yes, I can try. I have — they promised me they will give me hours. But I believe I can pay more. I could pay [$]200, [$]300." Asked again if he could pay that "based on his current income," he said, "Oh, now? No, I don't think so. I'll probably [be] left with nothing, but, yeah." Asked how much he could pay per month, he testified, "I would usually end up having $170, $180 left over, but I do have money saved up from before."

At the hearing, the trial court orally found that Father's testimony was not credible. The court found that "his stated expenses exceed what he says his income is and it's unreasonable to expect that for three years, an individual in the current market is unable to find any work more than 13 hours a week." Asked by Father's counsel if the court was finding Father willfully underemployed, the court replied, "Willfully underemployed. Yes, ma'am." The juvenile court used the statutory default figure of $3,646.75 as Father's monthly income. The court noted that the State had neglected to include proof of Mother's childcare or medical expenses for G.A.C., and it declined to rely on the worksheet completed at the prior hearing showing those expenses, noting also that Mother had changed employment since the prior hearing. In response to counsel's question regarding whether support was calculated from the child's birth, the court stated, "Well, I have his tax returns going back three years, which is basically the period of time we're talking about here and it shows the same income for all three of those years. So, yes, ma'am."

The court subsequently entered a written order. In the written order, the court found that "the previous Magistrate's ruling entered on November 17, 2021 should be reconfirmed as the decree of this Court with the exception of child support and retroactive child support." The court imputed to Father the presumptive median gross income for males in the amount of $3,646.75, "as the defendant failed to produce reliable evidence of income and the Court has no reliable evidence of the defendant's income or income potential." The written ruling ordered Father to pay $589 per month plus a retroactive judgment of $18,848 to be paid by income assignment at the rate of $25 per month.

Father was permitted to proceed as indigent on appeal. In his affidavit of indigency, he averred that his take-home pay was $461.75 per month, that he paid $200 per month in rent, $25-50 per month for a telephone, $50-80 per month in groceries, and approximately $50 per month for laundry and clothing. He introduced pay stubs showing a net pay of $461.75 per month over six months.

## II.

We review findings of fact in a bench trial de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).

- 4 -

Determinations regarding witness credibility are entitled to great weight, as the trial court has the advantage of observing the demeanor and live testimony of witnesses. *Massey v. Casals*, 315 S.W.3d 788, 793-94 (Tenn. Ct. App. 2009). Credibility determinations will not be disturbed on appeal absent concrete, clear, and convincing evidence to the contrary. *Demers v. Demers*, 149 S.W.3d 61, 70 (Tenn. Ct. App. 2003). Questions of law are reviewed de novo with no presumption of correctness. *Massey*, 315 S.W.3d at 794.

We review a trial court's determinations regarding child support under an abuse of discretion standard. *State ex rel. Williams v. Woods*, 530 S.W.3d 129, 136 (Tenn. Ct. App. 2017). While trial courts previously held broad discretion in setting child support, the adoption of Tennessee's Child Support Guidelines "has limited the courts' discretion substantially, and decisions regarding child support must be made within the strictures of the Child Support Guidelines." *Id.* (quoting *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005)). An abuse of discretion occurs when the court "applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Richardson*, 189 S.W.3d at 725. "Discretionary decisions must, however, take the applicable law and the relevant facts into account." *Buntin v. Buntin*, 673 S.W.3d 593, 602 (Tenn. Ct. App. 2023) (quoting *Richardson*, 189 S.W.3d at 725), *perm. app. denied* (Tenn. June 28, 2023)).

III.

Father asserts that the juvenile court abused its discretion in setting the child support award above his claimed income given that he introduced tax documents to support his claimed income. The State responds that the court was within its discretion to determine Father's proof was unreliable. We conclude that, although the evidence does not preponderate against the determination that the proof introduced was not adequate or reliable to establish Father's gross income, the trial court erred in imputing the statutory amount through its errant approach to assessing whether Father produced reliable evidence of his income potential.

"Parents have 'deeply rooted moral responsibilities' to support their minor children." *Richardson*, 189 S.W.3d at 724 (quoting *Boggs v. Boggs*, 520 U.S. 833, 847 (1997)). This obligation to support is based not only on moral principles and decency, but it is also grounded in Tennessee law requiring "parents to support their minor children in a manner commensurate with their own means and station in life." *Id.* (citing Tenn. Code Ann. § 34-1-102(a) (2001); *Wade v. Wade*, 115 S.W.3d 917, 920 (Tenn. Ct. App. 2002)).

Child support determinations are governed by the Child Support Guidelines created by the Department of Human Services. *Griffin v. Griffin*, No. M2019-01113-COA-R3-CV, 2020 WL 4873251, at *9 (Tenn. Ct. App. Aug. 19, 2020) (citing Tenn. Code Ann. § 36-5-101(e)). The Guidelines delineate the method by which courts determine the gross

income of each parent. *Massey*, 315 S.W.3d at 795 (citing Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)). "The fairness of a child support award depends on an accurate determination of both parents' gross income or ability to support." *Id.* "Tennessee's Child Support Guidelines have the force of law" and are designed to ensure that children receive support reasonably consistent with their parents' financial wherewithal. *State ex rel. Williams v. Woods*, 530 S.W.3d 129, 137 (Tenn. Ct. App. 2017) (quoting *Sykes v. Sykes*, No. M2012-01146-COA-R3-CV, 2013 WL 4714369, at *2 (Tenn. Ct. App. Aug. 28, 2013)).

While a parent's gross income is generally used in calculating child support, the Guidelines allow courts to attribute income that is not reflected in the parent's gross income in "limited situations." *Massey*, 315 S.W.3d at 795. As pertinent here, income may be attributed "[i]f a parent has been determined by a tribunal to be willfully underemployed or unemployed" or "[w]hen there is no reliable evidence of income due to a parent failing to participate in a child support proceeding or a parent failing to supply adequate and reliable financial information in a child support proceeding." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(i)(I)-(II).

Willful underemployment and lack of adequate and reliable evidence are two distinct inquiries. A finding of willful underemployment does not cast doubt on the accuracy of the amount that the parent is actually earning, but instead is a conclusion that the parent has made unreasonable employment choices in light of his or her obligation to support the child. Willful underemployment analysis comes into play when "the obligor parent's income may have been accurately reported, but the court is authorized to set the child support obligation on a higher potential income because the obligor has chosen to pursue an occupation or business venture which produces substantially less income than the parent is capable of earning." *Eatherly v. Eatherly*, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *4 (Tenn. Ct. App. May 4, 2001).

On the other hand, when the income reported does not reflect the realities of the parent's actual income, a court may impute additional income in response to the unreliable evidence of actual income. *Id.* This prong may come into play when the court believes a parent has underreported his or her true income or assets. *See, e.g.*, *Garrett v. Elmore*, No. M2013-01564-COA-R3-JV, 2014 WL 3763806, at *11 (Tenn. Ct. App. July 29, 2014) (father's tax returns did not include income from a second job and showed less income than he claimed in a loan application, and the court did not err in finding the tax returns unreliable and imputing the statutory amount); *Rudd v. Rudd*, No. W2009-00251-COA-R3-CV, 2009 WL 4642582, at *10-11 (Tenn. Ct. App. Dec. 9, 2009) (the court did not err in imputing the statutory amount when father claimed his business had a negative income, but he provided no documentation and mother testified the business earned a greater income). While the two concepts, underemployment and unreliability of income reporting, are distinct conceptually, one "approach, or sometimes both, may be appropriate for consideration depending upon the allegations of the cause of the low income." *Eatherly*,

- 6 -

2001 WL 468665, at *5.

Father challenges the juvenile court's written finding imputing the statutory median gross income to him because the court found that it had "no reliable evidence of [Father's] income or income potential" because Father "failed to produce reliable evidence of income." *See Massey*, 315 S.W.3d at 795 ("Income may . . . be imputed to a parent where the court has been provided no reliable evidence of the parent's income."). Under the regulations,

I. If a parent fails to produce adequate and reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining current ability to support or ability to support in prior years for calculating retroactive support); and

II. The tribunal has no adequate and reliable evidence of the parent's income or income potential;

III. Then, in such cases, the tribunal must take into consideration the specific circumstances of the parent to the extent known, including, but not limited to, the following factors:

A. Assets;
B. Residence;
C. Employment and earnings history;
D. Job skills;
E. Educational attainment;
F. Literacy;
G. Age;
H. Health;
I. Criminal record and other employment barriers;
J. Records of seeking work;
K. The local job market;
L. The availability of employers willing to hire the parents;
M. Prevailing earnings level in the local community; and
N. Other relevant background factors.

IV. If imputation of income is authorized, gross income for the current and prior years shall be determined by imputing annual gross income of forty-three thousand seven hundred sixty-one dollars ($43,761) for male parents and thirty-five thousand nine hundred thirty-six dollars ($35,936) for female parents. These figures represent the full time, year-round workers' median gross income, for the Tennessee population only, from the American Community Survey of 2016 from the U.S. Census Bureau.

- 7 -

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iv)(I).

Accordingly, the statute requires the court to first determine whether the parent has introduced adequate and reliable evidence of the parent's actual income, listing as examples of reliable evidence tax returns and check stubs. If the parent has failed to introduce such evidence, the court then determines whether other evidence constitutes adequate and reliable evidence of the parent's income.

At this stage, if there is no reliable evidence of actual income, the court shifts its focus to determine if there is reliable evidence regarding the parent's income potential. *See In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *14 (Tenn. Ct. App. Feb. 23, 2018) ("We must also determine whether the trial court made 'an accurate assessment' of potential income." (quoting *Hyden v. Hyden*, No. 02A01-9611-CH-00273, 1997 WL 593800, at *3 (Tenn. Ct. App. Sept. 25, 1997)). If the court finds neither reliable evidence of actual income nor reliable evidence of income potential, the court next proceeds to consider the statutory factors and to impute income as specified by the statute.[3]

Father argues that imputing income was improper in this case because the doorway for unreliability-grounded income imputation, an absence of adequate and reliable evidence of income, was not opened. With regard to unreliability-grounded imputation, Father is correct insofar as courts, unsurprisingly, "may not impute income for purposes of child support when reliable evidence of a parent's income has been presented." *Brewer v. Brewer*, No. M2005-02844-COA-R3-CV, 2007 WL 3005346, at *10 (Tenn. Ct. App. Oct. 15, 2007). "Thus, the median income amount is only available in the event reliable evidence of a parent's income or income potential is not presented." *Garrett*, 2014 WL 3763806, at *11. The imputed amount is merely a fallback when there is a dearth of evidence on which the court can rely. *Al Qaisi v. Alia*, No. M2020-00390-COA-R3-CV, 2021 WL 345416, at *8 (Tenn. Ct. App. Jan. 28, 2021) (citing *In re Samuel P.*, 2018 WL 1046784, at *13).

---

[3] We note that there is a tension in this statute in that, after finding that there is no reliable evidence of income or income potential, the court "must take into consideration the specific circumstances of the parent to the extent known," assessing statutory factors that would bear on income. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iv)(I)III. Nevertheless, when imputation is authorized, the parent's income "*shall be* determined by imputing annual gross income" in specified monetary amounts reflecting the median gross income. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iv)(I)IV (emphasis added). Accordingly, since the dollar amount to be imputed is set by statute, the consideration of the statutory factors appears to be a nullity, unless such factors might later come into play under Tenn. Comp. R. & Regs. 1240-02-04-.07, which instructs that the amount of support established by the Guidelines is rebuttable and that the court may order a deviation. *See also* Tenn. Code Ann. § 36-5-101(e)(1)(A) ("In making the court's determination concerning the amount of support of any minor child or children of the parties, the court shall apply, as a rebuttable presumption, the child support guidelines . . . . "). The case at bar does not require us to grapple with the tension of the odd discordant fit between subparts III and IV.

Father notes that he introduced tax documents demonstrating his limited income of $6,000 per year and argues that this constitutes adequate and reliable evidence of his gross income. Tax returns and check stubs are among the items that by statute are expressly identified as reliable evidence of income. *Massey*, 315 S.W.3d at 794. However, the statutory list of reliable evidence is not exclusive, nor is it a bar to the consideration of other evidence. *See Garrett*, 2014 WL 3763806, at *9; *In re Brittany M.A.*, No. M2010-02173-COA-R3-JV, 2011 WL 4600435, at *3-4 (Tenn. Ct. App. Oct. 5, 2011) (mother's testimony about how much she earned as a dancer at an adult entertainment venue was reliable, and she was not entitled to have a lesser amount imputed). Nor are the documents listed in the statute conclusively adequate and reliable evidence of gross income. For instance, "the court may choose to disbelieve a parent's proof relative to his or her finances and deem it unreliable, even if it is the type of evidence listed in the guideline." *In re Samuel P.*, 2018 WL 1046784, at *14.

Tennessee courts have found that there was not adequate and reliable evidence of gross income when a parent presented evidence of income but this evidence was not adequate or reliable because the parent's expenses exceeded the parent's stated income,[4] because the parent's lifestyle demonstrated a higher income,[5] because documents of the type listed in the statute were contradicted by other evidence of income,[6] or because the evidence presented appeared incomplete.[7] *See also Karpovich v. Brannick*, No. W2017-

---

[4] *See, e.g.*, *In re Samuel P.*, 2018 WL 1046784, at *15-16 (concluding that father's tax returns were not adequate and reliable evidence of gross income because he claimed to have made $15,862 but was paying monthly personal expenses of $3,500, had made several lump payments ranging from $14,000 to $28,000 on a home, reported extremely high business expenses, and paid $8,000 over a period of months for a duplicate daycare); *Miller v. Welch*, 340 S.W.3d 708, 714 (Tenn. Ct. App. 2010) (affirming the finding that the father's stated expenses exceeded his claimed income and concluding that "[i]f Father's evidence as to his income is not accurate, then it is not reliable"); *Massey*, 315 S.W.3d at 791-92 (father spent over $100,000 on credit card payments in the year he claimed he was earning $70,000).

[5] *See, e.g.*, *In re Samuel P.*, 2018 WL 1046784, at *14 (father bought and paid off a home in two years, and the court found his professional and personal lifestyle did not comport with his alleged destitution); *Miller*, 340 S.W.3d at 710-11 (father had expensive cars not in keeping with his claimed income); *Massey*, 315 S.W.3d at 792 (father claimed limited income but owned an expensive home, was making renovations, and sent his other children to private school).

[6] *Garner v. Garner*, No. E2019-01420-COA-R3-CV, 2020 WL 4354918, at *11 (Tenn. Ct. App. July 29, 2020) (likening an imputation for alimony to one for child support and concluding that "the Trial Court clearly did not accept Husband's tax returns at face value" and instead credited testimony that the husband used business income for personal use); *Massey*, 315 S.W.3d at 792 (father claimed an income of $70,000 per year in the child support proceedings but an income of $240,000 per year in a mortgage application); *Parris v. Parris*, No. M2006-02068-COA-R3-CV, 2007 WL 2713723, at *10-11 (Tenn. Ct. App. Sept. 18, 2007) (father claimed zero income in tax returns and statements but made over $200,000 worth of deposits in his business checking account, some of which did not come from business income).

[7] *In re Samuel P.*, 2018 WL 1046784, at *14 (noting that self-employment may require scrutinizing the business to prevent manipulation of salary when it appears the records introduced by the parent are

01796-COA-R3-JV, 2019 WL 126879, at *5 (Tenn. Ct. App. Jan. 8, 2019) ("Tax returns may be useful in determining a parent's income, but they are not necessarily definitive."). Accordingly, even if the court accepts tax documents as proof of some portion of a parent's income, the court may find that such documents do not reflect the true gross income earned by the parent and are not adequate and reliable evidence of the parent's gross income. Like Captain Renault expressing shock to find gambling at Rick's in the film *Casablanca*, surprise that falsified income reporting on federal taxes does sometimes occur would be disingenuous. Simply stated, that tax records are an example of reliable evidence does not mean that the tax records themselves are necessarily reliable evidence as to income in every case. Credulity is not required of Tennessee courts where the evidence points towards the unreliability rather than reliability of such documents. Accordingly, the question becomes not whether Father presented authentic tax records but whether the tax records are reliable as to actual income in this case.

The State argues, among other things, that sick pay and advances on Father's earnings from Singh and Sons make the W-2s unreliable. However, Father clearly testified that these funds were included in the W-2s. Likewise, we are unpersuaded by the State's assertion that the loan to pay his attorney or unspecified money that Father had saved render the W-2s unreliable. *See Garrett*, 2014 WL 3763806, at *10 ("The regulatory definition of gross income does not include loans or student loans. Moreover, we find no basis to characterize loans, for which Mother incurs debt, as income.").

For his part, Father takes issue with the juvenile court's oral finding that Father's "stated expenses exceed what he says his income is." As noted above, a finding that the parent's expenses exceed the parent's stated income can support the conclusion that there is no reliable evidence of gross income and that the median income should be imputed to the parent.[8] Father's testimony at trial was that he earned $500 per month. He cataloged his expenses as: $250 per month for rent and utilities and $80 to $100 per month in food. Father testified that he had $170 or $180 of excess income each month.

Accordingly, Father's expenses were between $330 and $350 per month, and Father is correct that the juvenile court erroneously stated at the hearing that "his stated expenses exceed what he says his income is." Nevertheless, we note that Father's claimed finances simply do not add up. Father testified that he had between $170 and $180 dollars left each month after paying for rent, utilities, and food. If we calculate the lower end of Father's claimed expenses ($330 per month), then he would indeed have $170 left over from a $500 income. However, the proof introduced at trial was that $500 was not Father's take-home

---

inadequate); *Garrett*, 2014 WL 3763806, at *11 (affirming decision to impute statutory amount when a loan application, testimony, and pay stubs from a second job showed that the prior tax returns did not reflect father's actual gross income).

[8] Accordingly, Father is incorrect when he argues that the trial court never made an oral finding that evidence of his income was unreliable.

pay.  Father was subject to social security and Medicare withholding, making his take-home pay around $461.  This was confirmed by the pay stubs attached to his affidavit of indigency.   Furthermore, Father's affidavit of indigency estimated his expenses as: $200 for rent, $50-80 for groceries, $25-50 for telephone, and approximately $50 for laundry and clothing (in addition to the new child support award).  Again, on the lower end, his estimated expenses are $325 per month.  Father would have at best $136 per month left over according to his finances as detailed in the affidavit of indigency and $131 left over according to his trial testimony.  Yet he testified that he generally had $170 to $180 left over each month, and he likewise testified that he could "try" to pay $200 to $300 per month and stated, ". . . I believe I can pay more.  I could pay [$]200, [$]300."  Father's inexact accounting of his income is even more significant given the very slim margins by which he was allegedly living.

Nor are these the only concerns about the reliability of Father's representation as to his income.  In connection with the proceedings as to child support for the three children from his marriage, the court in that action concluded that the children were "well provided for" by Father and ordered a splitting of educational and medical bills by Father and his former wife.  It is unclear how Father is providing "well" for these three children and shouldering his share of the educational and medical expenses within the framework of income and expenditures that he has asserted.  Additionally, Father's W-2s for a part-time hourly employee are remarkably rounded numbers.  Father's W-2s reflect that he made not approximately but exactly $6,000 in two consecutive years and exactly $9,000 in another year.  While the juvenile court was not correct that Father's expenses exceeded his income, the evidence does not preponderate against the determination that Father's accounting did not add up, and accordingly the conclusion that his W-2s were not adequate and reliable proof of his gross income is supported by the record.

Where a court finds evidence of the parent's gross income unreliable, the court should consider whether it can make an accurate assessment of the party's income potential from reliable evidence.  *In re Samuel P.*, 2018 WL 1046784 at *14 ("We must also determine whether the trial court made 'an accurate assessment' of potential income.") (quoting *Hyden*, 1997 WL 593800, at *3); *see also Sekik v. Abdelnabi*, No. E2019-01302-COA-R3-CV, 2021 WL 120940, at *27 (Tenn. Ct. App. Jan. 13, 2021) ("While the Child Support Guidelines do contain a figure for the imputation of income, this figure is not determinative when other evidence is submitted to show the parent's income or income potential.").  Determining the amount of a parent's income potential is a question of fact. *In re Samuel P.*, 2018 WL 1046784 at *14 (citing *Sitz v. Sitz*, No. E2012-01726-COA-R3-CV, 2013 WL 5450416, at *11 (Tenn. Ct. App. Sept. 30, 2013)).  As is implicit in the requirement that a court have "adequate and reliable" evidence of the parent's income potential, Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iv)(II), "[a] finding of potential income must have an evidentiary basis."  *In re Samuel P.*, 2018 WL 1046784, at *16 (quoting *Eatherly*, 2001 WL 468665, at *11).  A court is not limited to the imputed statutory amount if there is reliable evidence of income potential.  *Armbrister v.*

- 11 -

*Armbrister*, No. E2010-01561-COA-R3-CV, 2011 WL 5830466, at \*5-6 (Tenn. Ct. App. Nov. 21, 2011) (rejecting father's argument that the court was required to attribute the statutory amount to him absent reliable proof of his income, because the court had reliable evidence, in the form of Father's testimony regarding his current income and additional potential work, of Father's income potential, having also found Father willfully underemployed).

Here, the juvenile court did not address Father's income potential when it imposed the award orally at the hearing. In its written order, the court merely recited that there was "no reliable evidence of the defendant's income or income potential." The trial court's reasoning as to potential income was predicated upon its conclusion that Father did not produce reliable evidence of actual income, treating actual income and potential income as synonymous. At trial, all the evidence confirmed that Father was an unskilled worker and that his potential income hovered around the minimum wage. Father earned $10 per hour at a gas station. Father had made a limited employment inquiry at two other nearby gas stations. The juvenile court judge, apparently crediting that Father was an unskilled worker, listed Taco Bell, Burger King, McDonald's, a dollar store, and grocery stores as other potential sources of income for Father via additional hours of work. There was no evidence that Father had education which would qualify him for a job with higher wages. Father previously earned a higher income driving a taxicab. However, this training and experience did not raise his income potential because the proof at trial demonstrated that without a car, he was unable to pursue this line of work. Accordingly, there was evidence introduced at trial which the trial court could have found was reliable evidence of Father's potential income. The trial court did not address this evidence in considering income potential, instead concluding that because Father did not produce reliable evidence of actual income there was no reliable evidence of potential income.

A court may only impute the statutory amount when there is not reliable evidence as to both actual income and income potential. Accordingly, we conclude that the court abused its discretion in imputing the statutory amount when it failed to consider whether there was reliable evidence of Father's income potential distinct from Father's failure to produce reliable evidence of actual income, treating the two as synonymous. *See Kelly v. Kelly*, No. M2010-00332-COA-R3-CV, 2011 WL 310544, at \*2 (Tenn. Ct. App. Jan. 20, 2011) (explaining that a trial court's failure to correctly identify and properly apply the appropriate legal principles is an abuse of discretion); *see also* Tenn. R. Civ. P. 52.01 ("In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."); *Friedsam v. Krisle*, No. M2021-00530-COA-R3-CV, 2022 WL 3654658, at \*7 (Tenn. Ct. App. Aug. 25, 2022) (failure to comply with Rule 52.01 generally requires vacating the judgment, although the appellate court may "soldier on" when the trial court's determination is readily ascertainable) (quoting *Hanson v. J.C. Hobbs Co.*, No. W2011-02523-COA-R3-CV, 2012 WL 5873582, at \*10 (Tenn. Ct. App. Nov. 21, 2012)).

The methodology for imputing income is based on a trial court's findings regarding three inquiries: willful underemployment, reliable evidence of income, and reliable evidence of income potential. When a parent is found to be willfully underemployed or unemployed, the court does not use the statutory amount to impute income but instead imputes additional income that reflects earning capacity and that is based on past and present employment and on education and training. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(ii)(II); *see infra* section IV. Alternatively, when there is no reliable evidence of income or of income potential, the court imputes gross income in the statutory amount. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iv)(I)IV.[9] In the third alternative, when a parent's proof of income is deemed unreliable but other reliable proof of income or income potential is introduced, the court no longer imputes the statutory amount. In such cases, Tennessee courts have based child support awards on the parent's potential income, so long as that potential income has been established by reliable proof.[10]

For instance, in *In re Samuel P.*, the financial information provided by an evasive parent was not reliable, but the trial court, by imputing $10,000 monthly income, "implicitly found *other* reliable evidence in the record to support a finding of Father's income *potential*." 2018 WL 1046784, at *16. This court affirmed the conclusion that there was evidence of a much higher income potential based on Father's high monthly expenses, suspiciously high business expenses, and costly purchases, but this court remanded for a determination of "true earning potential" because the figure chosen did not have an evidentiary basis. *Id.* at *16-17. Likewise, in *Miller v. Welch*, the father was a solo practitioner attorney and claimed to be earning a net income of around $18,000 per year, but the trial court found that his monthly expenses were around $3,000 and far exceeded his claimed income. 340 S.W.3d at 710-11. The trial court imputed $40,000 per year as the father's income, finding that father had the ability to earn a minimum of that amount. *Id.* at 711. This court affirmed the award, concluding that "the evidence does not preponderate against the Trial Court's finding that Father either was capable of making or actually was making $40,000 per year." *Id.* at 712-13 (collecting cases on willful underemployment); *see Sekik*, 2021 WL 120940, at *27 (determining the court did not err in imputing above the statutory amount in part because husband's initially agreeing to pay $2,000 per month was "evidence that even Husband believed that he had the ability to pay such an amount" and because husband should not benefit from what he deemed a lack of

---

[9] As noted above in footnote 4, there exists a seeming tension in the guidelines between subparts III and IV of Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iv)(I) on imputing income.

[10] We note here a gap of sorts. While the Guidelines prescribe a dollar amount to be imputed in the absence of reliable evidence of income or income potential, and while they describe factors a court must consider in imputing potential income when there is reliable evidence of income but the income does not reflect a reasonable employment decision, there is no particular instruction for circumstances in which there is reliable evidence of potential income but the court discredits the parent's proof regarding actual income. As noted above, in such cases, this Court has sensibly approved the use of the reliable evidence of potential income to determine the support amount.

reliable proof, but also analyzing pursuant to willful underemployment); *Wright v. Wright*, No. W2018-02163-COA-R3-CV, 2020 WL 1079266, at *15 (Tenn. Ct. App. Mar. 6, 2020) (concluding that the court erred in imputing income of less than the statutory amount and that it should have imputed $50,000 based on wife's education and testimony regarding income potential while also analyzing pursuant to willful unemployment); *Kelly*, 2011 WL 310544, at *6 (mother's tax returns showed minimal income in her work as a songwriter, but mother acknowledged this did not reflect her earning ability because she would receive royalties in the future for a song currently on the charts, and accordingly there was nothing to support imputing minimum wage to mother as potential income; the trial court on remand was directed to attempt to determine mother's potential income and to impute the statutory amount if it was unable to do so); *Armbrister*, 2011 WL 5830466, at *6 (concluding that the tribunal had reliable evidence of father's income potential under subsection (3)(a)2(iv), in particular his own testimony regarding how much he could have earned in another field, and that the court was not limited to the statutory amount but "articulated a reasonable amount of income for Father," whom it also found willfully underemployed). Accordingly, this court has found that reliable proof of income potential includes a lifestyle or expenses which could not be supported by the parent's claimed income,[11] voluntarily assuming child support obligations which the parent would not be able to pay from the parent's claimed income,[12] past ability to earn income,[13] reliable evidence regarding employment which is available to the parent,[14] and evidence in the record which establishes that the parent had access to funds beyond those claimed as income.[15]

Because the record contained proof of Father's income potential that the trial court could have deemed reliable had it considered income potential distinct from actual income and that the trial court failed to address, we vacate the judgment awarding the imputed statutory amount. On remand, the court may consider income potential as a basis for the determination of child support, or it may determine that the case is better analyzed as one of willful underemployment. *See infra* section IV; *see also In re Jaiden C.W.*, No. M2010-01105-COA-R3-JV, 2011 WL 2306057, at *3 (Tenn. Ct. App. June 7, 2011) ("Courts employ the [statutory] figure, however, to impute income to a parent who fails to provide reliable evidence of income or income potential, not to provide an upward deviation in income for a willfully underemployed parent.").

IV.

---

[11] *In re Samuel P.*, 2018 WL 1046784, at *16; *Miller*, 340 S.W.3d at 710-11.

[12] *Sekik*, 2021 WL 120940, at *27.

[13] *Sekik*, 2021 WL 120940, at *27 (looking at past ability).

[14] *Armbrister*, 2011 WL 5830466, at *6.

[15] *In re Samuel P.*, 2018 WL 1046784, at *15-17 (observing that self-employed father's business expenses were extremely high).

Father argues that the imputed amount likewise cannot be attributed to him pursuant to a finding that he was willfully underemployed. The juvenile court orally found that Father was willfully underemployed. However, this basis for imputing income did not appear in the written order. "In Tennessee, trial courts speak through their orders." *Smallman v. Smallman*, No. M2022-00592-COA-R3-CV, 2023 WL 7483428, at *8 (Tenn. Ct. App. Nov. 13, 2023) (citing *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001)). The written order does not reflect that the juvenile court relied on willful underemployment but instead on unreliable evidence of income in setting the child support award.

> The two approaches, establishing potential income in a willful underemployment situation and imputing income where actual ability to receive income from business activities is underreported, while dependent on different factual underpinnings, are both methods to arrive at the most accurate determination of the obligor parent's income and ability to support. Where a self-employed individual's reported income is low, either approach, or sometimes both, may be appropriate for consideration depending upon the allegations of the cause of the low income.

*Eatherly v. Eatherly*, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *5 & n.5 (Tenn. Ct. App. May 4, 2001) (footnote omitted) (stating also that "[t]his court has sometimes found the theories intertwined, or found them both to be implicated by the circumstances"); *see Dilley v. Dilley*, No. M2009-02585-COA-R3-CV, 2011 WL 2015395, at *7 (Tenn. Ct. App. May 23, 2011) (affirming an award based on father's income potential as evidenced by past employment, observing that the trial court not only found father underemployed but also disbelieved father's alleged income, and noting the court could also impute income when there is no reliable evidence of income). In the case at bar, because the court made an oral finding of willful underemployment, refusing to credit Father's assertions that he was only able to find 12 to 13 hours of work a week, and because we have vacated the imputed statutory amount above, we address, in the interest of judicial efficiency on remand, the juvenile court's analysis of willful underemployment.

The Guidelines specify the circumstances in which a court may find a parent willfully underemployed:

> The Guidelines do not presume that any parent is willfully underemployed or unemployed. The purpose of the determination is to ascertain the reasons for the parent's occupational choices, to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren), and to determine whether such choices benefit the children.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(ii). Accordingly, when a parent's decision to work a lower paying job is reasonable and made in good faith, the court will not find the

parent willfully underemployed. *Miller*, 340 S.W.3d at 712. "[T]he reasons for an obligor parent's decision to accept lower paying employment are relevant." *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002). However, "[w]hile parents have the right to pursue their own happiness and to make reasonable employment choices, they will not be permitted to avoid their duty to support their children by decreasing their income." *Richardson v. Spanos*, 189 S.W.3d 720, 726 (Tenn. Ct. App. 2005). Imputing income for willful unemployment or underemployment is "based on the premise that parents may not avoid their financial responsibility to their children by unreasonably failing to exercise their earning capacity." *Miller*, 340 S.W.3d at 712 (quoting *Massey v. Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009)). Thus "a party's child support obligation is not measured by his or her actual income but rather by his or her potential income as evidenced by his or her educational level and previous work experience," *Richardson*, 189 S.W.3d at 726, and "courts should increase an underemployed parent's gross income to an amount that reflects the parent's income potential or earning capacity based upon his or her educational level and previous work experience," *Strickland v. Strickland*, No. M2013-02657-COA-R3-CV, 2014 WL 4440667, at *5 (Tenn. Ct. App. Sept. 9, 2014). Willful underemployment or unemployment "is not limited to choices motivated by an intent to avoid or reduce the payment of child support." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(ii)(I); *see Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996) (concluding that husband, who had been unemployed throughout the relationship, was not motivated by his desire to avoid child support but that the court should have calculated support based on his potential income as demonstrated by his education and prior employment). Instead, it "may be based on any intentional choice or act that adversely affects a parent's income." Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(ii)(I)I.

Willful underemployment and the parent's potential income are questions of fact decided after a careful consideration of the attendant circumstances. *Richardson*, 189 S.W.3d at 726. The burden is on the party asserting willful underemployment. *Demers v. Demers*, 149 S.W.3d 61, 69 (Tenn. Ct. App. 2003). "The trial court must consider the obligor parent's past and present employment and determine whether the decision" which resulted in low income "was made in good faith." *Id.*

In order to guide trial courts in assessing willful underemployment and unemployment, the statute provides a list of factors that "may be considered by a tribunal when making a determination of willful underemployment or unemployment," including:

(I) The parent's past and present employment;

(II) The parent's education, training, and ability to work;

(III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life. In considering whether there should be any imputation of income to a stay-at-home parent, the

- 16 -

tribunal shall consider:

> I. Whether the parent acted in the role of full-time caretaker while the parents were living in the same household;
> II. The length of time the parent staying at home has remained out of the workforce for this purpose; and
> III. The age of the minor children.

(IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;

(V) The parent's role as caretaker of a handicapped or seriously ill child of that parent, or any other handicapped or seriously ill relative for whom that parent has assumed the role of caretaker which eliminates or substantially reduces the parent's ability to work outside the home, and the need of that parent to continue in that role in the future;

(VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future; and

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(iii).

While the statute instructs that these factors "may be" considered in determining willful underemployment or unemployment, the statute has mandatory requirements which a court must follow in calculating additional imputed income after determining willful underemployment:

(II) Once a parent has been found to be willfully underemployed or unemployed, additional income can be allocated to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity, and the increased amount shall be used for child support calculation purposes. The additional income allocated to the parent shall be determined using the following criteria:

> I. The parent's past and present employment; and

II. The parent's education and training.

Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(ii)(II). "A court finding an obligor parent willfully and voluntarily underemployed must make a finding as to the parent's potential earnings, taking into consideration the obligor's educational level and/or previous work experience." *Dilley*, 2011 WL 2015395, at *7 (collecting cases).

In the present case, the juvenile court did not conduct the analysis outlined by the regulations cited above. Not only did it omit any discussion of the factors which courts "may" consider in determining underemployment, it did not use the mandatory criteria regarding Father's past and present employment or training and education in imputing income.

The evidence at trial showed that Father had been consistently working far below full time over the past three years. Father testified he worked approximately 12 or 13 hours per week at a gas station, making $10 per hour. Father attributed his very few work hours to the pandemic, but he also worked considerably less than full time in 2019, prior to the onset of the pandemic.[16] Father also pled a lack of transportation, but he acknowledged that he lived "about a block away from Highway 51" and that "[a]round the corner from [him] is a dollar store and whole bunch of businesses." Furthermore, his testimony established he lived within three miles of other businesses. He had around $170 of disposable income per month and agreed that it was feasible for him to obtain a bicycle to extend his range of work options. Yet, in the three years at issue, Father's attempts to increase his gainful employment were limited to asking his current employers for additional hours, applying at Circle K gas station, and having "spoken" to the BP gas station.[17] Father is capable of working additional hours, as he testified he had attempted to

---

[16] The trial court, after having orally found willful underemployment, confirmed that the award would be retroactive, stating, "Well, I have his tax returns going back three years, which is basically the period of time we're talking about here and it shows the same income for all three of those years." Father takes exception to this finding, noting he earned $9,000 in 2019 and $6,000 in 2020 and 2021. While the income for the three years is not the same, his 2019 figures reflect that he worked substantially less than a full-time job, logging a little over 17 hours per week instead of a little under 12 hours per week as he did in 2020 and 2021. The thrust of the court's statement was not that the amounts were identical but that Father had been underemployed during the entirety of the child's life and that a retroactive award imputing income for the duration of the child's life was therefore appropriate.

[17] Father takes exception to the trial judge's oral statement that "[t]here is not a Taco Bell, a Burger King, a McDonald's, a fast-food restaurant in this town that does not have a help wanted sign. There's not a grocery store that won't hire people if you can walk in the door." We agree with Father that the record did not contain any evidence regarding market conditions and that any reliance on this statement in finding Father underemployed was error. *See Vaughn v. Shelby Williams of Tenn., Inc.*, 813 S.W.2d 132, 133 n.2 (Tenn. 1991) ("It is not appropriate to judicially notice facts that are beyond the scope of the knowledge of the general public, but are known instead to the judge through his personal, extrajudicial, experience."); Tenn. R. Evid. 201(b). However, the record did contain other evidence relevant to whether Father's

do so. Father does not provide care for any dependent individuals, and he is not receiving training or education to improve his employment circumstances.

Accordingly, the trial court may have had a sound evidentiary basis to find Father willfully underemployed. Nevertheless, it was an abuse of discretion to fail to use the mandatory criteria in determining the amount of imputed income pursuant to willful underemployment. Imputing income based on willful underemployment requires the court to consider the parent's past and present employment and education and training in calculating additional income. The court appeared to accept that Father, who was currently working at a gas station, was an unskilled worker, asking him why he had not attempted to procure other unskilled jobs, such as working at McDonald's or a grocery store. There is no evidence Father had training or education to qualify him for work earning higher wages, and he was unable to make money as a driver because he had lost his vehicle. The court did not consider the factors under subsection (3)(a)2(ii)(II) in determining a reasonable imputed income for Father but instead relied on the statutory amount used when there is no reliable evidence of a parent's income or income potential. On remand, the court may impute additional income to Father based on a determination of willful underemployment. If it relies on willful underemployment, the juvenile court should impute income based on the statutory considerations in Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)2(ii)(II).

V.

For the aforementioned reasons, the judgment of the Juvenile Court for Shelby County is vacated, and the case is remanded for further proceedings consistent with this opinion. Costs of the appeal are taxed to the appellee, the State of Tennessee, for which execution may issue if necessary.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE

---

underemployment was willful. The record demonstrates that Father claims he worked less than 18 hours per week in 2019 and around 12 hours per week in 2020 and 2021. Yet Father's efforts to increase his earnings over these three years were limited to asking his current employers for more hours, applying at one other gas station, and having "spoken" to a third gas station. *See Demers*, 149 S.W.3d at 72 ("The record is devoid of evidence that Father has taken any affirmative steps to find regular employment."); *State ex rel. Ledbetter v. Godsey*, No. M1998-00958-COA-R3-CV, 2000 WL 798641, at *8 (Tenn. Ct. App. June 22, 2000) (courts "look at the reasonableness of the obligor parent's . . . efforts" in assessing whether underemployment is willful); *see, e.g., Stack v. Stack*, No. M2014-02439-COA-R3-CV, 2016 WL 4186839, at *10 (Tenn. Ct. App. Aug. 4, 2016) ("[T]he court appropriately based its decision that Mother was not willfully underemployed on Mother's efforts to find full-time employment, her education and training, and her previous work history.").